Filed 1/24/14  P. v. Coleman CA

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

**IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA**

**FOURTH APPELLATE DISTRICT**

**DIVISION TWO**

| | |
|---|---|
| THE PEOPLE, | |
| Plaintiff and Respondent, | E055934 |
| v. | (Super.Ct.No. FVI019546) |
| PEARL COLEMAN, | **OPINION** |
| Defendant and Appellant. | |

APPEAL from the Superior Court of San Bernardino County.  Jules E. Fleuret, Judge.  Affirmed with directions.

Torres & Torres and Steven A. Torres, under appointment by the Court of Appeal, for Defendant and Appellant.

Kamala D. Harris, Attorney General, Dane R. Gillette, Chief Assistant Attorney General, Julie L. Garland, Senior Assistant Attorney General, Randall Einhorn, and Charles C. Ragland, Deputy Attorneys General, for Plaintiff and Respondent.

1

Defendant Pearl Coleman stabbed her husband in the chest during an argument. The knife severed two major arteries and he subsequently bled to death. She was convicted of premeditated, deliberate and willful first degree murder and use of a knife.

Defendant now contends on appeal as follows:

1.     The trial court erred and violated her rights to a fair trial and to present a defense by excluding evidence of the victim's propensity for violence proffered to be admitted by her under Evidence Code section 1103.

2.     The prosecutor committed misconduct during closing argument.

3.     She should receive one additional day of presentence custody credit.

4.     The restitution fine imposed pursuant to Penal Code section 1202.4, subdivision (b)[1] violated the prohibition against ex post facto laws.

We modify the judgment to award defendant one additional day of presentence custody credit. We otherwise affirm the judgment in its entirety.

---

[1]     All further statutory references are to the Penal Code unless otherwise indicated.

# I

## PROCEDURAL BACKGROUND

Defendant was found guilty of premeditated, deliberate and willful first degree murder. (§ 187, subd. (a).) The jury also found true the allegation that she personally used a deadly or dangerous weapon, to wit, a knife. (§ 12022, subd. (b)(1).) Defendant was sentenced to 25 years to life for the first degree murder, plus 1 year for the use of the knife. Defendant was also ordered to pay a restitution fine pursuant to section 1202.4, subdivision (b) in the amount of $240, and a parole revocation fine in the same amount, stayed pending successful completion of parole. She was awarded 2,793 days of presentence custody credit.

# II

## FACTUAL BACKGROUND

A.    *People's Case-in-Chief*

On July 29, 2004,[2] James Strong was visiting his brother, Tyrone Lay, at his house located at 15548 Fresno Street in Victorville. Lay was married to defendant and they lived together. Defendant's sister, Leslie Crain, was also living at the residence.

Sometime around 12:00 a.m., defendant and Lay started arguing over a movie. Defendant wanted Lay to watch a movie with her but Lay wanted to leave in order to visit his other brother. Strong went into his bedroom. Defendant and Lay went into their

---

[2]    Prior to trial, defendant sought to plead guilty by reason of insanity but after she was evaluated the trial court found her competent. The delay in prosecution appears to be as a result of the competency proceedings.

bedroom and continued to argue. Their voices got louder as the argument progressed. Strong never heard any noises like someone was being hit or pushed.

Strong emerged from his bedroom and saw defendant and Lay arguing face-to-face in their bedroom. At some point, Strong and Crain stood between them to stop the fighting. Defendant walked off. Strong went back in his bedroom but left the door open. He observed Lay standing in the hallway in front of his bedroom. Defendant emerged from the kitchen approximately 30 to 40 seconds later. As she returned from the kitchen, Crain tried to restrain her because defendant had a knife in her hand.

Strong then observed defendant "swing the knife" that she had in her hand quickly toward Lay. Lay was stabbed. Lay said, "[Defendant] stabbed me." Crain grabbed a towel and applied pressure to the wound. Lay walked to the kitchen and then collapsed.

Strong had never before seen Lay hit or commit any sort of violence against defendant.

San Bernardino County Sheriff's Deputy Jarrod Burns was working patrol in the early morning hours of July 29, 2004. At approximately 12:26 a.m., he went to defendant and Lay's home due to a report of a disturbance at the location.

Deputy Burns entered the residence and found Crain and defendant standing in the kitchen. Deputy Burns observed Lay lying on the kitchen floor in a pool of blood. He was holding a towel to his chest area. He appeared to be applying pressure to a wound. Crain and defendant were yelling at each other. Deputy Burns ordered them to go outside. Deputy Burns searched the residence and found no other persons were present.

4

Lay's breathing was labored and he could not talk. Paramedics arrived and moved him to the living room. Defendant was transported to the hospital and was pronounced dead at the hospital.

Sergeant Timothy L. Jordan was assigned to investigate the stabbing. Lay was no longer at the residence when Sergeant Jordan arrived. There was a large amount of blood in the hallway, living room, and kitchen. In the bedroom, a large butcher knife was found behind a piece of luggage that was in the room. There was blood halfway up the blade on the knife.

An autopsy was performed on Lay on August 2, 2004. Lay died as a result of the stab wound to his chest. The stab wound was on his upper left side. Two major blood vessels had been severed. The upper part of his left lung was cut. The knife went into his body at an angle downward. The length of the wound was four to five inches. The blade of the knife used was seven inches. The blood on the knife went up five inches from the tip. Lay died as a result of a massive amount of blood loss from the two blood vessels that were severed.

The bloodstain patterns in the house were analyzed. The bleeding had started in the doorway of the bedroom of the residence. The bloodstains showed that Lay had fallen down but had been able to get up and walk to the kitchen.

Detective Manny Mendoza spoke with Strong. Strong told him that he observed Crain standing between defendant and Lay. Defendant swung the knife at Lay. Crain was saying, "no, no, no," to defendant. Strong saw the knife go into Lay's upper chest.

5

A second interview of Strong was played for the jury. In that interview, he stated he did not actually see the stabbing. He saw defendant swing the knife, but did not see it go into Lay's body.

B.    *Defense*

Defendant testified on her own behalf. Defendant was raised in Compton by her grandparents. Defendant was not raised by her mother because her mother was abusive and a drug addict. While defendant was growing up, she was molested by several family members when she was four years old. When she was 11 years old, she was raped. She reported the incident and the person who raped her was prosecuted. When she was 13 years old, she was gang raped. She was raped again when she was 14 years old. She never received any counseling.

She married Lay in 2003. Lay had been abusive during their marriage. Lay was violent with her and she was afraid of him. She claimed he had previously choked her, "socked" her in the eye and beat her. She never called the police. He also beat her son but she never reported it.

Defendant claimed the argument between her and Lay began in the early morning hours of July 29, or late in the evening on July 28, because he had "peed on the toilet." This made her upset. Further, Lay wanted to watch a movie that she did not want to watch. She and Lay were arguing in their bedroom and Crain and Strong broke them up. Defendant claimed they had been pushing each other. Defendant left the bedroom.

6

They continued to argue in the hallway. Defendant told Lay to leave the house because she was afraid of him. Lay pushed her to the ground while they were in the hallway. When he pushed her to the ground she just "snapped."

Defendant went to the kitchen and she "believed" she grabbed a knife. She wanted to scare Lay so he would leave the house. After this, her recollection was "fuzzy." She never intended to kill or hurt Lay. She did not recall actually stabbing him.

She did not recall how the knife ended up in Strong's room. She could not recall why she just did not leave the house even though she was scared of Lay. Later in her testimony, she recalled holding the knife straight and it going in Lay. She could not remember how exactly she stabbed Lay. However, she denied she swung downward when she stabbed Lay.

Dr. Marjorie Graham-Howard was a licensed clinical psychologist. Dr. Graham-Howard had interviewed defendant on two occasions: March 2010 and November 2011. Dr. Graham-Howard diagnosed defendant with major depressive disorder, post traumatic stress disorder (PTSD) and with trichotillomania which was obsessive plucking of her eyebrows and other hair in order to alleviate stress. The PTSD was caused by her being raped and molested as a child.

It was common for a person with PTSD to act irrationally in certain stressful situations. It was also common for sufferers to not recall traumatic events. Dr. Graham-Howard admitted she took defendant's word that she had been raped and did not follow up to investigate whether it was true.

7

Defendant had told Dr. Graham-Howard that she was afraid of Lay because he had threatened to kill her when she tried to leave. Dr. Graham-Howard acknowledged that another psychiatrist had interviewed defendant and determined that defendant was malingering or pretending to have a serious mental illness.

C. *Rebuttal*

Prior to trial, defendant told sheriff's detectives that she and Lay had been arguing and she suggested that they should split up. He called her several names. Defendant went outside to get some air. When she came back inside, Lay was bleeding. Later in the interview, she admitted she grabbed a knife from the kitchen so that he would leave her alone and to just scare him. She did not want to hurt him and was scared when she realized he had been stabbed. She described and demonstrated with a ruler that she was holding the knife straight out and just pushed it toward him to scare him.

III

EVIDENCE CODE SECTION 1103 – PROPENSITY FOR VIOLENCE
EVIDENCE

Defendant contends that the trial court erred and violated her federal due process rights because she was not allowed to cross-examine Strong about Lay's prior conviction involving violence. She claimed the prosecutor had opened the door to admission of evidence of Lay's propensity for violence by asking Strong if he had ever seen Lay be violent with defendant.

8

A.     *Additional Factual Background*

On cross-examination, Strong was asked if he had seen Lay be violent with defendant, and he answered, as he had on direct examination, that he not seen Lay be violent with defendant. Strong was then asked if he had seen Lay be violent with anyone other than defendant. The prosecutor's objection was sustained. Defendant's counsel then asked Strong, "Now, do you know if Tyrone was violent with the person he killed and went to prison over?" The prosecutor's relevancy objection was sustained and the parties approached the bench.

Defense counsel stated at sidebar that the prosecutor had opened the door to admission of Lay's violent character when he asked Strong questions about Lay's propensity for violence toward defendant. The trial court noted that it was the first time it had been advised that Lay had gone to prison for killing someone. The prosecutor responded that Lay had gone to prison for some kind of felony assault, not murder. Defense counsel understood that Lay had killed someone.

Defense counsel stated he had requested a RAP sheet for Lay, but had not been given one. He claimed Lay had gone to prison in Nebraska for over seven years. The trial court initially ruled that defense counsel could ask the question of Strong.

The prosecutor objected, arguing that he had not introduced "any evidence of the victim's propensity for lack of violence." There was only evidence regarding violence between defendant and Lay; it was not general propensity for violence evidence. Defendant's counsel noted that if defendant testified, he could ask her if she was aware of the conviction and the prosecutor agreed that the question could be asked. The trial court

9

then reviewed Strong's testimony. The trial court noted the question that had been asked by the prosecutor was, "Did you ever in your life see Tyrone hit or do any sort of violence to the defendant." Strong had responded no. Defendant argued that the question opened the door for the violence of Lay and that there were other incidents of violence.

The trial court did not believe the question rose to the level of propensity for violence. It stated, "He did not express an opinion that the character of the victim was - - that he had a peaceful character or that he was not a peaceful person. The call of the question was only as it related to the defendant." The trial court ruled, "So at this point I would say that there hasn't been any propensity evidence of the victim that can be rebutted." The trial court noted that if defendant "takes the stands [sic] and says she knows about it, that's a different issue."

Later, outside the presence of the jury, the prosecutor noted that Lay had an arrest for attempted murder and assault with a deadly weapon. Lay's RAP sheet showed he was never convicted of murder or attempted murder. The trial court responded, "Well, my point is this: Assuming that the issue of the victim's propensity for violence was raised, which I ruled it was not, I wanted to make certain that there was a good-faith raising of the issue of the prior conviction." The trial court felt that defense counsel could ask defendant, if she testified, if she was aware of the incident. During defendant's testimony, she was not asked about Lay's prior conviction.

B.     *Analysis*

"[C]haracter evidence is generally inadmissible to prove a person acted in conformity with it on a given occasion." (*People v. Myers* (2007) 148 Cal.App.4th 546,

552; Evid. Code, § 1101.) Evidence Code section 1103 provides for an exception to this general rule as follows: "(a) In a criminal action, evidence of the character or a trait of character (in the form of an opinion, evidence of reputation, or evidence of specific instances of conduct) of the victim of the crime for which the defendant is being prosecuted is not made inadmissible by Section 1101 if the evidence is: [¶] (1) Offered by the defendant to prove conduct of the victim in conformity with the character or trait of character. [¶] (2) Offered by the prosecution to rebut evidence adduced by the defendant under paragraph (1)."

It has been held that in a prosecution for a homicide or assaultive crime where self-defense is raised, evidence of the violent character of the victim is generally admissible to show the victim was the aggressor. (*People v. Shoemaker* (1982) 135 Cal.App.3d 442, 446.) We review for abuse of discretion a trial court's rulings on relevance and admission or exclusion of evidence under Evidence Code section 1103. (See *People v. Davis* (2009) 46 Cal.4th 539, 602.)

At the time that the defendant sought to elicit Lay's propensity for violence from Strong in the form of a prior murder or assaultive conduct conviction, defense counsel never stated that it was admissible because defendant intended to claim she acted in self-defense. Defense counsel argued that the prosecutor opened the door to admission of Lay's propensity for violence. There was no offer of proof that defendant acted in self-defense. Based on the evidence before the trial court at the time it ruled on defendant's request to admit Lay's propensity for violence, there was nothing supporting its admission. The prosecutor limited the question as to Lay's violence against defendant,

11

and what Strong had observed.  Defendant cannot now argue on appeal that it was admissible at that time to show self-defense based on all of the evidence presented in the case.  The trial court properly determined the prosecutor had not opened the door to the admission of Lay's propensity for violence.

Moreover, the trial court did not exclude the evidence in its entirety.  It was clear that defendant was given the opportunity to present Lay's prior conviction and whether she was aware of it in her own case.  Defendant testified and was never asked if she knew Lay had a prior violent conviction.  As such, defendant was given the opportunity to present the evidence and failed to do so.  She cannot now claim on appeal that the trial court abused its discretion or her due process rights were violated due to the exclusion of Lay's propensity for violence when she failed to present the evidence.

Even if we assume the trial court erred by excluding evidence of Lay's previous conviction or arrest for a violent assault or attempted murder, any such error was harmless because it would not have resulted in a more favorable verdict to defendant. (*People v. Rodrigues* (1994) 8 Cal.4th 1060, 1124-1125 ["Where, as here, a discretionary power is statutorily vested in the trial court, its exercise of that discretion 'must not be disturbed on appeal *except* on a showing that the court exercised its discretion in an arbitrary, capricious or patently absurd manner that resulted in a manifest miscarriage of justice.  [Citations.]'  [Citation.]"]; see also *People v. Watson* (1956) 46 Cal.2d 818, 836.) This analysis applies equally to defendant's claim that she received ineffective assistance of counsel due to trial counsel's failure to admit the evidence or request a ruling prior to trial.  In order to show ineffective assistance of counsel, defendant must demonstrate that

12

it is reasonably probable a more favorable result would have been obtained in the absence of counsel's failings. (*Strickland v. Washington* (1984) 466 U.S. 668, 691-694.)

Here, the evidence of self-defense was weak. Strong testified that Lay and defendant had been fighting but that defendant had walked to the kitchen and Lay was standing in the hallway. Defendant returned with a knife and Crain tried to restrain her. Defendant then swung the knife and stabbed Lay in the chest. Strong never saw Lay make any movement toward defendant. Defendant herself admitted she grabbed the knife to scare Lay and not because he was making any aggressive movements toward her. Further, defendant testified as to many prior acts of violence committed by Lay against her that the jury clearly rejected. Since the evidence of self-defense was weak, Lay's propensity for violence would have had no impact on the jury.

On the other hand, the evidence that defendant committed premeditated and deliberate first degree murder was strong. Defendant walked away from her argument with Lay and went to the kitchen. She grabbed a very large knife and immediately approached Lay. She fought off Crain and was able to stab Lay, pushing the knife in his chest at least four to five inches. She severed several major blood vessels. Lay did nothing to fight back against defendant.

In sum, it is not reasonably probable that use of Lay's prior violent act as evidence of a propensity for violence would have resulted in a more favorable outcome for defendant. (*People v. Watson, supra,* 46 Cal.2d at p. 836.)

13

# IV

## PROSECUTORIAL MISCONDUCT

Defendant contends that the prosecutor committed misconduct by improperly analogizing premeditation and deliberation to a decision to swing a baseball bat.

A.    *Standard of Review*

"'The standards governing review of [prosecutorial] misconduct claims are settled. "A prosecutor who uses deceptive or reprehensible methods to persuade the jury commits misconduct, and such actions require reversal under the federal Constitution when they infect the trial with such '"unfairness as to make the resulting conviction a denial of due process."' [Citations.] Under state law, a prosecutor who uses such methods commits misconduct even when those actions do not result in a fundamentally unfair trial." [Citation.] "In order to preserve a claim of misconduct, a defendant must make a timely objection and request an admonition; only if an admonition would not have cured the harm is the claim of misconduct preserved for review." [Citation.] When a claim of misconduct is based on the prosecutor's comments before the jury, "'the question is whether there is a reasonable likelihood that the jury construed or applied any of the complained-of remarks in an objectionable fashion.'" [Citation.]' [Citation.]" (*People v. Gonzales* (2011) 51 Cal.4th 894, 920.) In assessing prejudice, we "'do not lightly infer'" the jury drew the most damaging meaning from the prosecutor's statements. (*People v. Frye* (1998) 18 Cal.4th 894, 970, disapproved on a different point in *People v. Doolin* (2009) 45 Cal.4th 390, 421, fn. 22.)

B.      *Analysis*

The prosecutor, during his argument, initially read from the given instruction on premeditation and deliberation. The prosecutor addressed deliberation as follows: "The defendant after this argument, or pushing, or whatever you want to believe, she walked away from Tyrone, went all the way to the kitchen, looked through a drawer until she found a knife that was big enough to kill somebody with, then walked all the way through the hallway and stabbed Tyrone." The prosecutor explained that if the argument had taken place in the kitchen, and defendant had grabbed a knife that was right there, picked it up and then stabbed him, that would have been closer to second degree murder. The prosecutor further stated, "[s]he went to the kitchen to get that knife. And that indicates premeditation and intent to kill." It was enough time for her to premeditate the murder during the 30 seconds she was in the kitchen.

The prosecutor again referred to the instruction on premeditation and deliberation in stating, ". . . the length of time the person spends considering whether to kill does not alone determine whether the killing is deliberate and premeditated. The amount of time required for deliberation and premeditation may vary from person to person and according to the circumstances. A decision to kill made rashly, impulsively or without careful consideration is not deliberate and premeditated."

The prosecutor then presented his analogy to baseball as follows: "For example, a batter's decision, if you're in baseball, a batter's decision whether to swing at a pitch is a willful, deliberate, premeditated decision. Watching the pitcher throw the ball, the batter has to decide, you know, should I swing or not, is this pitch going to be too high, is it too

15

low, is it inside, is it outside, is it coming too fast, is it curving, and he has to consider, what's going to happen if I swing?  What if I swing high and I miss and it pops out, or I ground into a double play?  He then has to make the decision to swing and make the decision how to swing.  It doesn't take a lot of time to do that, the batter doesn't have much time, but he's [*sic*] still makes a willful, deliberate, and premeditated decision.  [¶]  So did [defendant].  And she had a lot more time than a batter would at a baseball.  So, therefore, she's guilty of first degree murder."

Initially, respondent claims the claim was forfeited due to trial counsel's failure to contemporaneously object and request a jury admonition.  It is true that no prosecutorial misconduct can be shown due to the failure to object.  (*People v. Clark* (2011) 52 Cal.4th 856, 960; *People v. Bonilla* (2007) 41 Cal.4th 313, 336.)  However, since defendant also argues that if she waived the claim because of counsel's failure to object to the instance of alleged misconduct, she received ineffective assistance of counsel, we will consider her claim that she was prejudiced by the comments.

There is no requisite minimum length of time between the prior reflection on killing a person and taking action to commit the killing.  (*People v. Stitely* (2005) 35 Cal.4th 514, 543.)  Thoughts may follow each other with great rapidity and cold, calculated judgment.  (*Ibid.*)  The prosecutor's argument was not inconsistent with these definitions, especially in light of its entire comments on premeditation and deliberation.  Further, defendant's contention that the amount of time it takes a batter to decide to swing at a pitch is too short as a matter of law is not supported by any authority.  This

16

analogy appears to fall within the wide latitude given to a prosecutor during closing argument.

Nonetheless, any misconduct, even if error was assumed, it would not be prejudicial. "Under traditional application of this state's harmless error rule, the test of prejudice is whether it is 'reasonably probable that a result more favorable to the defendant would have occurred had the district attorney refrained from the comment attacked by the defendant. [Citations.]' [Citation.] However, if federal constitutional error is involved, then the burden shifts to the state 'to prove beyond a reasonable doubt that the error complained of did not contribute to the verdict obtained.' [Citation.]" (*People v. Bolton* (1979) 23 Cal.3d 208, 214.)

Initially, the jury was properly instructed on premeditation and deliberation. The jury was instructed that defendant was being prosecuted for first degree murder on a theory of premeditation and deliberation. It was instructed that "[t]he defendant acted willfully if she intended to kill." In addition, "[t]he defendant acted deliberately if she carefully weighed the considerations for and against her choice and knowing the consequences decided to kill." In addition, they were instructed, "[t]he defendant acted with premeditation if she decided to kill before completing the act that caused the death." They were also advised, "[t]he length of time the person spends considering whether to kill does not alone determine whether the killing is deliberate and premeditated. The amount of time required for deliberation and premeditation may vary from person to person and according to the circumstances. A decision to kill made rashly, impulsively or without careful consideration is not deliberate and premeditated. On the other hand, a

17

cold, calculated decision to kill can be reached quickly. The test is the extent of the reflection, not the length of time." The prosecutor also reiterated the instructions in his argument, as set forth, *ante*. We presume the jurors followed the given instructions. (*People v. Yeoman* (2003) 31 Cal.4th 93, 139.)

Finally, as set forth *ante*, the evidence of premeditation and deliberation was strong. Defendant walked away from an argument with Lay and returned 30 to 40 seconds later with a long knife. The blade of the knife was seven inches. She fought off Crain in order to stab Lay in the chest causing him to bleed to death. Based on the foregoing, the evidence clearly established that defendant committed the murder of Lay with premeditation and deliberation.

V

CUSTODY CREDIT

Defendant contends, and the People concede, that she is entitled to one additional day of presentence custody credit. Defendant was arrested on July 29, 2004. She was sentenced on March 22, 2012. The trial court granted her 2,793 days of presentence custody credit.

A defendant is entitled to actual custody credit for "all days of custody" in county jail and residential treatment facilities, including partial days. (§ 2900.5, subd. (a); *People v. Smith* (1989) 211 Cal.App.3d 523, 526.) Calculation of custody credit begins on the day of arrest and continues through the day of sentencing. (*People v. Bravo* (1990) 219 Cal.App.3d 729, 735.) As such, defendant was entitled to one additional day

18

of custody credit, for a total of 2,794 days. We will order that she receive one additional day of presentence custody credit.

## VI

## RESTITUTION FINE

Defendant contends the trial court relied upon the recent amendment to section 1202.4, subdivision (b) to impose a $240 restitution fine. She argues this violated the prohibition against ex post facto laws because the amendment occurred after she committed the crime.

At the time of sentencing, the trial court ordered as follows: "I'll order a restitution fund fine in the amount of $240 to be collected by the Department of Corrections. [¶] An additional restitution fund fine will be ordered but stayed pending successful completion of parole, at which time the stay will become permanent."

Effective January 1, 2012, the minimum restitution fine to be imposed pursuant to section 1202.4, subdivision (b) was increased to $240. (Stats. 2011, ch. 358, § 1.) Prior to that date, the minimum fine was $200. (See *People v. Souza* (2012) 54 Cal.4th 90, 143.) "It is well established that the imposition of restitution fines constitutes punishment, and therefore is subject to the proscriptions of the ex post facto clause and other constitutional provisions. [Citations.]" (*Id.* at p. 143.) Defendant clearly committed her crime prior to the amendment of section 1202.4 in 2012 and could claim an ex post facto violation if the trial court imposed the minimum restitution fine based on the amendment in 2012.

Initially, respondent contends that defendant has waived the claim by failing to object to the amount in the trial court. The failure to make a timely and meaningful objection forfeits or waives certain claims on appeal. (*People v. Scott* (1994) 9 Cal.4th 331, 351.) This includes "complaints about the manner in which the trial court exercises its sentencing discretion and articulates its supporting reasons." (*Id.* at p. 356.) "The appropriate amount of restitution is precisely the sort of factual determination that can and should be brought to the trial court's attention if the defendant believes the award is excessive." (*People v. Garcia* (2010) 185 Cal.App.4th 1203, 1218 [Fourth Dist., Div. Two].) Since defendant did not object to the amount of restitution, and as we find below, the fine was not unauthorized, she has forfeited the claim on appeal.

Defendant's restitution fine did not result in an unauthorized sentence. The court had the discretion to lawfully impose the greater fine of $240 prior to the amendment to section 1202.4. The range was between $200 and $10,000. There was no ex post facto error because the court imposed a lawfully authorized fine.

Defendant claims that the trial court intended to impose the least amount of restitution that it could and relied on the minimum amount in the amended statute. However, the existence of "[e]rror is never presumed, but must be affirmatively shown, and the burden is upon the appellant to present a record showing it, any uncertainty in the record in that respect being resolved against him." (*People v. Clifton* (1969) 270 Cal.App.2d 860, 862.) Defendant has failed to provide anything in the record before us supporting that the trial court based the restitution fine on the newly amended statute.

20

The probation report did not state that $240 was the minimum fine. The trial court never stated it was imposing the minimum fine. We will not presume error.

VII

DISPOSITION

The judgment is modified to reflect that defendant is awarded 2,794 days of section 2900.5 presentence custody credits. In all other respects, the judgment is affirmed. The clerk of the trial court is directed to issue an amended abstract of judgment reflecting the modified judgment and deliver copies of such amended abstracts of judgment to the Department of Corrections and Rehabilitation.

NOT TO BE PUBLISHED IN OFFICIAL REPORTS

RICHLI
Acting P. J.

We concur:

KING
J.

MILLER
J.

21